# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROSEMARY PETRO-RYDER** | : **CIVIL ACTION** |
| | : |
| **v.** | : |
| | : **NO. 15-2908** |
| **CAPT. JACQUELINE PITTMAN, et al.** | : |

## MEMORANDUM OPINION

**KEARNEY, J.**                                                        **DECEMBER 11, 2015**

A Caucasian female police officer claiming her African-American female supervisor discriminated against her based on race or gender, retaliated against her for filing complaints, or created a hostile work environment for Caucasian police officers, must adduce facts supporting her claims. After her boss declined her request for a new assignment within a week of working for her, the Caucasian officer may view many employment decisions affecting her through the prism of a declined reassignment. While she may earnestly believe her boss is out to get her because of their differing races or because she complained, she must show discriminatory animus, retaliatory conduct or a hostile work environment based on facts not speculation. Even a dozen incidents are not enough if there is no supporting evidence. She may need only one actionable incident to create discrimination and retaliation questions for the jury. But she needs at least one. She can no longer rely on her perceived slights to overcome her employer's and supervisor's motion for summary judgment. In the accompanying Order, we grant her employer's and supervisor's motion for summary judgment as there are no genuine issues of material fact and judgment is warranted as a matter of law.

## I.  UNDISPUTED FACTS

Plaintiff Rosemary Petro-Ryder ("Petro-Ryder") is a Lieutenant in the Philadelphia Police Department (the "Department") detailed to the 26th Police District.[1]  The Department hired Petro-Ryder on October 15, 2001.[2]  She is Caucasian.  George Gianfortune served as Captain in the 26th District before Pittman.[3]  At the time of Captain Gianfortune's appointment, Petro-Ryder served as Lieutenant of the "Two-Platoon."[4]  In this capacity, Petro-Ryder supervised communications to ensure smooth operations meeting the captain's expectations.[5]  Captain Gianfortune asked Petro-Ryder to serve as his administrative lieutenant.[6]  The administrative lieutenant is officially a member of "Five-Platoon" but oversees a large number of administrative functions including school crossing guards, administrative staff, public matters, and scheduling of activities.[7]

Defendant City of Philadelphia (the "City) employs Defendant Jacqueline Pittman ("Pittman") as a Police Captain in the Department.[8]  Pittman is African-American. On May 19, 2014, the Department assigned Pittman to Captain of the 26th District and Petro-Ryder as her administrative lieutenant.[9]  One week later, on May 26, 2014, Petro-Ryder requested removal as administrative lieutenant and be placed back on "Two-Platoon."[10]  Pittman granted Petro-Ryder's request to be removed as administrative lieutenant but denied her request to be placed on "Two-Platoon."[11]  Instead, Pittman assigned her to "Three-Platoon," which is also referred to as "last out" because it is the overnight shift.[12]  Petro-Ryder remained as administrative lieutenant until June 27, 2014, and began her service with "Three-Platoon" on June 30, 2014.[13]

During her tenure under Pittman, Petro-Ryder perceived at least twelve (12) instances of adverse employment actions which she attributes to discrimination against her because she is a

Caucasian female and Pittman is an African-American female and in retaliation for her objecting to alleged discrimination against other Caucasian females:

a)     Assigning Petro-Ryder to monitor the CO-26 email exclusively;

b)     Tasking Petro-Ryder with assignments outside of her work area;

c)     Yelling at Petro-Ryder and degraded her in front of other supervisors by saying she was a "weak supervisor" and had to be "trained like an 8-year old";

d)     Ordering Petro-Ryder to resubmit memorandums and other reports;

e)     Removing only the Caucasian officers from 5 squad and gradually replacing them with African-American officers;

f)     Sending emails with Martin Luther King Jr. quotes appended to Pittman's signature block;

g)     Hanging a poster of President Obama with the quote "this is our moment" in her office;

h)     Changing Petro-Ryder's shift time to a steady 9 a.m. to 5 p.m.;

i)     Assigning Petro-Ryder to "last out" on May 27, 2014;

j)     Selecting Petro-Ryder to remain on "last out" as a "commissioner's pick"

k)     Issuing a formal counseling memorandum on June 11, 2014; and

l)     Including negative remarks on Petro-Ryder's June 26, 2015 performance review.

On July 7, 2014, July 28, 2014 and August 22, 2014, Petro-Ryder complained to the PHRC and EEOC alleging discrimination as to her and towards a Corporal Aversa, receiving her right to sue letter on March 3, 2015.

On May 26, 2015, Petro-Ryder sued Pittman and the City. She now seeks "all relief provided under the law" for race or gender discrimination and denial of equal protection, retaliation for opposing perceived discrimination and hostile work environment.

On August 5, 2015, Petro-Ryder filed another EEOC complaint alleging hostile work environment and retaliation arising from an April 9, 2015 drug test and a June 26, 2015 performance evaluation. The EEOC has not issued a right to sue letter.

## II.   ANALYSIS

Defendants move for summary judgment.[14]   Defendants argue: Petro-Ryder cannot establish a *prima facie* case of Title VII race and gender discrimination, retaliation and a hostile work environment; she fails to show Defendants' legitimate non-discriminatory reasons for any

adverse actions were pretext for race or gender discrimination or retaliation; she did not engage in protected activity required to sustain her First Amendment retaliation claim; her speech is not a substantially motivating factor in any retaliatory action taken against her; and,  she cannot establish an Equal Protection claim because she cannot demonstrate different treatment than those similarly situated.

### A.     Petro-Ryder has not exhausted her administrative remedies for any claims arising after March 3, 2015.

" '[S]trict adherence to Title VII's timely filing requirements is the best guarantee of evenhanded administration of the law.' "[15]  Before filing a Title VII lawsuit, a plaintiff must comply with the procedural requirements set forth in 42 U.S.C. § 2000e-5.  A plaintiff must first exhaust her administrative remedies by filing a timely discrimination charge with the EEOC.[16]  The EEOC is then tasked with investigating the charge and has exclusive jurisdiction for at least one hundred and eighty (180) days.[17]  The EEOC may then end its investigation and issue a right to sue letter, after receipt of which the complainant has ninety (90) days to file suit in federal court.[18]   The EEOC's right to sue letter "indicates a complainant has exhausted administrative remedies" and a plaintiff "may not bring a Title VII suit without having first received a right-to-sue letter."[19]

Petro-Ryder filed her initial EEOC complaint on August 22, 2014.  She received a right to sue letter on March 3, 2015 and initiated this suit on May 26, 2015, within the ninety (90) days required by Title VII.  On August 5, 2015, Petro-Ryder filed a second EEOC complaint alleging additional retaliatory events and further evidence of an alleged hostile work environment.  The exclusive jurisdiction period of one-hundred and eighty (180) days has not run and EEOC has not issued a right to sue letter for her August 5, 2015 complaint.

4

Petro-Ryder admits the EEOC has not issued a right to sue letter for her August 5, 2015 complaint. She argues the lack of a right to sue letter is a curable defect any time before trial.[20] We generally agree with her cited case law. Our Court of Appeals has held "that issuance of a right-to-sue letter is a statutory prerequisite that does not deprive a district court of jurisdiction and may be satisfied by issuance of the letter after the complaint has been filed."[21]

Petro-Ryder block quotes an opinion penned by our estimable colleague Judge Baylson but provides no citation. We believe the case is *Youssef v. Anvil Intern.*, No. 06-4926, 2008 WL 618654, *2 (E.D. Pa. Mar. 3, 2008). In *Youssef*, Judge Baylson dismissed a complaint filed before the receipt of a right-to-sue letter when, at the time he decided the motion, plaintiff had not provided evidence of the letter.[22] The plaintiff filed for reconsideration and attached the right-to-sue letter. Judge Baylson considered it "newly discovered evidence" and reversed himself.[23] However, Petro-Ryder is now at the summary judgment stage and the one hundred and eighty (180) day EEOC jurisdiction will not expire until February 2016, which is after the long scheduled trial date in January 2016. Petro-Ryder chose to assert these claims before the right to sue letter issued. Her choice has not worked. We recognize it is the exhaustion of agency remedies which is required, rather than the receipt of the right to sue letter, but the latter indicates the completion of the former.[24] Here, Petro-Ryder has not received a right to sue letter indicating her exhaustion of remedies. We dismiss the claims raised in the August 5, 2015 administrative charge without prejudice to file a timely action as to any cognizable claim in the August 5, 2015 charge.

**B.      Petro-Ryder's *prima facie* case of race discrimination.[25]**

Petro-Ryder admits she does not have direct evidence of race discrimination. We then proceed under the *McDonnell Douglas* burden shifting framework.[26] We must first determine

whether Petro-Ryder adduced sufficient evidence of a *prima facie* case of race discrimination: (1) she is a member of the protected class; (2) who suffered an adverse employment action; and (3) the circumstances of the adverse employment action give rise to an inference of discrimination.[27]

Because Petro-Ryder is a member of the majority group, "the literal application of the [*McDonnell Douglas*] test would preclude its use by White plaintiffs alleging 'reverse discrimination.' "[28]   Courts in this circuit apply a "modified version" of the test to claims of "reverse discrimination in employment."[29] To establish a *prima facie* case under this modified version, a plaintiff must present "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of his race . . . ."[30]

Even if she adduces evidence of being treated less favorably than others because she is Caucasian, Petro-Ryder must still show an adverse employment action for a *prima facie* case.[31] If she shows adverse employment action, the burden shifts to Defendants to articulate a legitimate non-discriminatory reason for an adverse action[32]   Once Defendants proffer a non-discriminatory reason, the burden returns to Petro-Ryder to adduce facts showing the stated non-discriminatory reason was merely pretext for race discrimination.[33]

Petro-Ryder alleges twelve (12) adverse actions taken by Pittman against her:

a)   Assigned her to monitor the CO-26 email exclusively;
b)   Tasked her with assignments outside of her work area;
c)   Yelled and degraded her in front of other supervisors by saying she "was a weak supervisor" and had to be "trained like an 8-year old."
d)   Ordered her to resubmit memorandums and other reports;
e)   Removed only the Caucasian officers from 5 squad and gradually replaced them with African-American officers;
f)   Sent emails with Martin Luther King Jr. quotes appended to Pittman's signature block;

6

g)  Maintained a poster of President Obama with the quote "this is our moment"   in her office;

h)  Changed her shift time to a steady 9 a.m. to 5 p.m.;

i)  Assigned her to "last out" on May 27, 2014;

j)  Selected her to remain on "last out" as a "commissioner's pick;"

k)  Issued a formal counseling memorandum on June 11, 2014; and

l)  Included negative remarks on Petro-Ryder's June 26, 2015 performance review. [34]

Requiring an adverse employment action "'stems from the language of Title VII itself' making it unlawful for an employer to 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'"[35]  Title VII is not a "general civility code" and cannot provide relief for unpleasantness, "even if that unpleasantness may be motivated by racial animus."[36]  A plaintiff cannot seek redress from "petty slights and workplace grievances."[37]

### i.     *Monitoring the CO-26 email, resubmitting memoranda, and additional responsibilities.*

Petro-Ryder argues monitoring the CO-26 email, assigned tasks outside of her responsibilities, and having to resubmit memoranda constitute adverse employment actions.[38] She cites *Ferrell* and *Cabral v. Philadelphia Coca Cola Bottling Co.*, No. 02-2806, 2003 WL 1421297 (E.D. Pa. Mar. 18, 2003).  These cases are distinguishable.  In *Ferrell*, an employer allegedly subjected a female employer to *quid pro quo* sexual harassment.[39]  When she rebuffed the advances, her job assignments "began to change for the worse."[40]   Plaintiff changed to an undesirable shift to escape her supervisor.  *Id.* at *4.  When she returned to her previous shift, her harasser supervisor forced her onto worker's compensation leave.[41]  Ferrell's sexual harassment followed by forced worker's compensation leave is an adverse employment action. Pittman's actions fall far below this example.

7

In *Cabral*, plaintiff truck driver alleged his employer discriminated against Hispanics in assigning overtime shifts.[42]   Specifically, the plaintiff alleged his employer assigned only Hispanic drivers to shifts preventing them from working overtime shifts on the weekend.[43]   The court found this shift manipulation leading to a loss of overtime to be a sufficient adverse employment action as affecting compensation.

Petro-Ryder argues Pittman twice tasked her with performing duties outside of her responsibility as administrative lieutenant or "Three Platoon" Lieutenant.   There is no claim of lost compensation from these requests.   We do not find these adverse actions to be sufficient to sustain a discrimination claim.[44]   The monitoring of the CO-26 email is encompassed in the responsibilities of the administrative lieutenant.   Petro-Ryder argues Pitman required her to monitor the email account exclusively but Pittman informed Petro-Ryder she should delegate the task.[45]

Pittman's assignment of the responsibilities allegedly outside of Petro-Ryder's work area does not evidence favorable treatment of African-American officers.   In one instance, Petro-Ryder alleges Cheryl Weiss should have been tasked to handle a permit issue but instead Pittman assigned the job to her.   Petro-Ryder repeatedly alleges Cheryl Weiss is an African-American woman but Pittman's deposition testimony, her affidavit, and the Internal Affairs investigation indicates Cheryl Weiss is a Caucasian woman and both counsel confirmed she is Caucasian at argument.[46]   Regardless of Ms. Weiss' race, this permit issue assignment is not an adverse employment action.

In another instance, Petro-Ryder alleges Pittman tasked her with discovering why an officer had not been sick checked.[47]   According to her, Pittman already assigned an African-American woman, Renee Butler, to be in charge of sick checks and asking Petro-Ryder to look

8

into this issue evidenced Pittman's racial animosity.[48]   The Department assigned Petro-Ryder as the Lieutenant in the sick officer's platoon.   Pittman asking the platoon's lieutenant to investigate why an officer was not sick checked does not amount to an adverse employment action or evidence racial favoritism.   These additional responsibilities and excessive criticism over her submitted memorandums cannot constitute sufficient adverse employment actions.[49]

### ii.     Removal of Caucasian officers from the administrative unit.

Petro-Ryder argues Pittman removed all of the Caucasian officers from the administrative unit and replaced them with "mostly Black officers."[50]   Petro-Ryder contends before Pittman became Captain of the 26th District, there were no African-American officers in the administrative unit.[51]   After Pittman became captain, six African-American officers began working in the administrative unit.[52]   It is uncertain how this comparison relates in any way to adverse action against Petro-Ryder while in the administrative unit.   Defendants did not replace Petro-Ryder; she asked to leave the unit.   Pittman replaced Petro-Ryder with a Caucasian man Lieutenant Zimmerman, as an administrative lieutenant.[53]   Petro-Ryder adduces no evidence Pittman assigned African-American officers to the administrative squad over more qualified Caucasian officers who actually applied for the job or were recommended.   Without evidence, we are entirely speculating as to the motive behind Pittman's assignment of these officers.   As for the removal of the Caucasian officers from the administrative squad, Pittman testified, without any contrary evidence, Sergeant Bernard had surgery and needed to take leave, Cheryl Weiss retired, Officer Fetcher returned to traffic division, and the Department's Inspector reassigned Sergeant Watkins because he was not working enough hours.[54]   Regardless, these circumstances provide no evidence of an adverse action suffered by Petro-Ryder.

### iii. *Counseling Memorandum and 2014 Performance Review.*

The counseling memorandum and performance rating cannot constitute an adverse action for discrimination purposes.[55]   In *Torres*, the plaintiff Philadelphia police officer received a counseling memorandum which she alleged constituted an adverse employment action.[56]   Judge Brody disagreed, finding a single counseling memorandum cannot constitute an adverse action:

> The [Department] uses counseling forms as a tool for training employees and does not consider them to be disciplinary action.  Counseling forms are never placed in an employee's personnel file.  Furthermore, they cannot result in any disciplinary action being taken against an employee such as a loss in pay, transfer, or suspension nor can they influence an employee's eligibility for promotions or raises. [57]

Petro-Ryder agrees a counseling memorandum cannot constitute formal discipline and can be considered instructive.[58]   Accordingly, the counseling memorandum is not an adverse action.

Petro-Ryder attempts to rely on *Rivers v. Potter*[59] to argue the counseling memorandum constitutes an adverse employment action.  Petro-Ryder chose to block quote the wrong section of the *Rivers* opinion.  The quoted section discusses a Title VII retaliation claim where the court found a "letter of warning" sufficient to constitute an adverse action for a retaliation claim.  However, the standards for an adverse employment action in the retaliation context differ from those in the discrimination context.[60]   The court in *Rivers* also discussed the "letter of warning" in the race discrimination context and found it insufficient to constitute an adverse employment action.[61]

Petro-Ryder claims Pittman yelled at her and degraded her in front of other officers by saying "she was a weak supervisor" and had to be "trained like an 8-year old."[62]  " '[U]nnecessary derogatory comments' do not rise to the level of 'adverse employment actions.' "[63]   These comments, no matter how unpleasant, do not constitute an adverse employment action.

As for the performance review, Petro-Ryder received "Satisfactory" ratings in all performance factors. [64] "It is well settled that a satisfactory performance review, without more, is insufficient to constitute an adverse employment action." [65] Petro-Ryder argues the remarks made in the "Comments to Employee" section convert this to an adverse employment action but she failed to adduce evidence how these comments affected her employment status in any measurable way.

### iv. Post of President Barack Obama and email quotes from Martin Luther King, Jr.

Pittman's poster of President Obama in her office, as well as the inclusion of Martin Luther King, Jr. quotations in her email signature block cannot constitute adverse employment actions.[66] They have nothing to do with Petro-Ryder's employment or any action taken against her. They cannot be adverse employment actions as to Petro-Ryder.[67]

### v. Change of hours, assignment to "last out," and reassignment to last out.

After peeling away the layers of non-adverse employment actions, we come to the gravamen of Petro-Ryder's complaint: the change in her shift times and assignment to "last out" and continued assignment on that platoon.

Before Pittman became Captain of the 26th District, Petro-Ryder worked on two different shift schedules.[68]   Three days a week she worked from 10:00 a.m. to 6:00 p.m. while the remaining two days she worked 6:00 a.m. to 2:00 p.m.[69]   When Pittman became Captain, she changed the administrative lieutenant's shift to a steady 9:00 a.m. to 5:00 p.m.[70]   Then, when Petro-Ryder requested she be reassigned to "Two-Platoon" from the administrative unit, Pittman granted her request to leave the administrative unit but placed her in  "Three Platoon," which is known as "last out" because it encompasses the overnight shift.[71]   In October 2014, when the Department detailed Petro-Ryder to the 24th District, she submitted a memorandum to the 24th

District Captain expressing her desire to be removed from last out shift.[72]   Pittman did not receive the memorandum sent to the 24th District Captain and renewed Petro-Ryder's assignment to the last out shift.[73]

Our Court of Appeals recognizes "[a]ssigning an employee to an undesirable schedule can be more than a 'trivial' or minor change in the employee's working conditions."[74]   In *Mondzelewski*, a supermarket changed a meat department employee's schedule to a 9:30 a.m. to 6:00 p.m. consistent schedule.[75]   Generally, meat department employees work one of two shifts: 6:00 a.m. to 2:00 p.m. or 12:00 p.m. to around 8:00 p.m.[76]   The plaintiff proffered affidavits from other department employees showing only workers the employer intended to punish were assigned this shift, which they referred to as punishment shifts.[77]   While acknowledging the change in schedule was not practically significant, it found a reasonable juror could conclude it altered the terms or conditions of the plaintiff's employment.[78]

We find Petro-Rider's claims differ from *Mondzelewski* because she testified having no issue with working the "9 to 5" shift.[79]   The plaintiff in *Mondzelewski* complained the shift was undesirable due to the requirement of having to work on Saturday and also the loss of "customary free time."[80]   While Petro-Ryder's brief complains of the same harm, her deposition testimony directly contradicts this assertion.[81]   Therefore, the change in hours cannot constitute an adverse employment action for Petro-Ryder's discrimination claim.[82]

In contrast, we find sufficient adverse employment action arising from the assignment to "last out" and her October 2014 renewed assignment on the challenged shift.[83]   We find a reasonable juror could conclude changing Petro-Ryder from a steady day shift to the "last out" night shift constituted an adverse employment action which altered the terms or conditions of her employment.[84]

But we cannot find these two instances occurred under circumstances giving rise to an inference of race discrimination.  "The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race . . . ."[85] Here, all of the other lieutenants who were eligible for "last out" were also Caucasian.  We find no reasonable factfinder could conclude Petro-Ryder's assignment to "last out" or her renewed assignment to "last out" occurred under circumstances inferring racial discrimination where all of the candidates for "last out" were the same race as Petro-Ryder.  Yet, even if an inference were present, we find there are no genuine issues of material fact with regard to Defendants legitimate non-discriminatory reasons and the absence of pretext.

**B.   Petro-Ryder cannot show Defendants' legitimate non-discriminatory reasons are pretext for race discrimination.**

While we are skeptical the "last out" assignments evidence the Defendants treated non-Caucasian employees more favorably, we find even if it does, Petro-Ryder cannot show the legitimate reasons for her move were pretext.

Under *McDonnell Douglas*, once Petro-Ryder establishes a *prima facie* case, the burden shifts to Defendants to produce a legitimate non-discriminatory reason for the adverse employment action.[86]  Defendants meet the relatively light burden.  Pittman testified "Two-Platoon" had a lieutenant already who according to Pittman ran the platoon well.  Pittman selected Lieutenant Zimmerman, a Caucasian man, to replace Petro-Ryder as administrative lieutenant.[87]  At the time of his selection, the Department assigned Lieutenant Zimmerman as the lieutenant in "Three Platoon."[88]  Pittman decided it would be easiest to swap Petro-Ryder and Zimmerman rather than moving multiple lieutenants from platoons which were being run well.

After reassigning her to the "last out" shift, Defendants detailed Petro-Ryder to the 24th District beginning July 9, 2014, where she continued to work the "last out" shift.[89]  In October

2014, when Defendants determined the "last out" assignments for the following year, Petro-Ryder expressed her desire to be removed from "last out" through a memorandum submitted to the 24th District Captain.[90]   Because Defendants only detailed Petro-Ryder to the 24th, she was still a member of the 26th District and the decision regarding her reassignment to "last out" resided with Pittman.[91]   Pittman did not receive the memorandum submitted to the 24th District Captain and reassigned Petro-Ryder to "last out" as a "Commissioner's Pick."[92]   These reasons satisfy Defendants' burden at this stage.

### C.   Petro-Ryder cannot adduce facts to show pretext.

Under *McDonnell Douglas*, the burden returns to Petro-Ryder to show the Defendants' reasons are actually pretext for race discrimination.[93]   "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[94]

Petro-Ryder attempts to discredit Pittman's proffered reasons.  Specifically, she argues she was treated differently than African-American supervisors and civilians because they were returned to their previous assignments after leaving administrative squad.  She argues Pittman's reasons are inconsistent because while she did not want "to uproot the squads" supervised by Lieutenants Volack and McDonald, she chose Lieutenant Zimmerman to be the administrative lieutenant.  Moreover, she argues her renewed assignment to "last out" lacked a legitimate reason.[95]

Petro-Ryder's first attempt fails as she can provide no evidence to support her claim other than her speculative belief the Defendants treated African-American supervisors and officers more favorably. At the pretext stage, the "court's factual inquiry [then] proceeds to a new level of specificity."[96] "The plaintiff has the burden of demonstrating that similarly situated persons were treated differently."[97] Similarly situated does not mean identically situated, but they must be similar in all relevant respects.[98]

Petro-Ryder provides no examples of similarly situated persons treated more favorably based on their race. Instead, Petro-Ryder baldly asserts she "was treated differently than Black supervisors and civilians because when they left the administrative squad they were returned to their previous assignments."[99] Tellingly, she provides no identification of who these similarly situated persons are, or the circumstances surrounding their move from the administrative squad to another squad. This is insufficient comparator evidence to defeat summary judgment.

Petro-Ryder's second reason for disbelieving Pittman similarly fails. To prove pretext by discrediting the employer's articulated reasons, Petro-Ryder must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons."[100] It is not Petro-Ryder's burden to show "the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or incompetent."[101] Petro-Ryder argues Pittman's reasons are inconsistent because she expressed her desire not to "uproot the squads" run by other Lieutenants and yet uprooted Lieutenant Zimmerman to become the administrative lieutenant.[102] After evaluation, we find no reasonable factfinder could

15

rationally find this reason unworthy of credence.  The Department required Pittman to move at least one lieutenant to make room for Petro-Ryder's return to a platoon.  She chose Zimmerman to be her administrative lieutenant and, instead of moving multiple lieutenants to accommodate Petro-Ryder, Pittman placed her in Lieutenant Zimmerman's former position.  Petro-Ryder admits this decision made more sense to simply switch her with Zimmerman rather than assign her to Two-Platoon.[103]  Simply, Petro-Ryder is challenging the soundness of Pittman's decision and fails to show discriminatory animus is the actual reason for her assignment. Petro-Ryder failed to cast doubt on the reasons proffered by Pittman.

With regard to Pittman's October 2014 renewal of Petro-Ryder's "last out" assignment, Petro-Ryder attempts to establish Pittman's "lack of legitimate reason" for renewing the assignment.  Petro-Ryder argues Pittman chose her to remain on "last out" duty despite Petro-Ryder having seniority over two of the other three lieutenants: McDonald and Volack.[104]  Petro-Ryder erroneously argues the "Commissioner's pick," used by Pittman on Petro-Ryder was to be "based on seniority."[105]   However, her assertion is belied by her own testimony and the record evidence.  Petro-Ryder testified that a "Commissioner's Pick" is not based on seniority but instead allows the assigning supervisor to place any officer on "last out" and her renewal was in fact a "Commissioner's Pick" by Pittman.[106]  According to Department policy, fifty percent (50%) of the "last out" shift is decided based on seniority, while the remaining fifty percent (50%) are "Commissioner's Picks."[107]   Given these facts, and viewing them in the light most favorable to Petro-Ryder, no reasonable juror could conclude discrimination more likely than not motivated her discharge.

16

**D.      Petro-Ryder's gender discrimination claim must be dismissed.**

Petro-Ryder claims Pittman discriminated against her because she is a female. Gender discrimination is also analyzed within the parameters of the *McDonnell Douglas* framework. To establish a gender discrimination claim, Petro-Ryder must show (1) she is a member of the protected class; (2) who suffered an adverse employment action; and (3) the circumstances of the adverse employment action give rise to an inference of discrimination.[108]

Our analysis of this gender discrimination claim is the same as for Petro-Ryder's race discrimination claim. Petro-Ryder does not offer additional argument on the issue. The heading of her analysis only lists race discrimination as the subject of her analysis.[109] This is either an oversight or an attempt to mask the reality her allegations are wholly inconsistent. In some allegations, Pittman treated African-American females more favorably seemingly suggesting that the real issue is race discrimination.[110]  However, in other allegations, Pittman treated the Caucasian men more favorably, suggesting the issue is not race discrimination but gender.[111] Counsel for Petro-Ryder confirmed at oral argument Petro-Ryder's primary complaint about the assignment to "last out" shift and her renewal in that assignment is of gender discrimination. As we stated in our race discrimination analysis, the three other lieutenants eligible for the "last out" shift were all white males.

Regardless, we find our analysis in the race discrimination section also applies here and although we find Petro-Ryder has shown an adverse action—her 2014 assignment to "last out" and the renewal of that assignment—which occurred under an inference of gender discrimination, she still cannot show the legitimate non-discriminatory reasons for the action are actually pretext for gender discrimination.[112]  We addressed her arguments as to the "last out" assignment in the context of the inapplicable race discrimination claim.  Our analysis applies

here.    What has become clear through this litigation is Petro-Ryder did not get along with Pittman after she replaced Petro-Ryder's former boss, Captain Gianfortune.   The two had a difficult time working together and often failed to communicate this difficulty.   While it may have been uncomfortable for Petro-Ryder during her brief tenure under Pittman, neither a "demanding boss" nor "personal animosity" can sustain a claim of discrimination.[113]   Summary judgment is granted on this claim.

### E.    Petro-Ryder's Title VII retaliation claim is subject to summary judgment.

To establish a Title VII retaliation claim, Petro-Ryder must show (1) she engaged in protected activity, (2) the employer took an adverse employment action against Petro-Ryder; and 3) a causal connection between the protected activity and the adverse action.[114]     In the retaliation context, what constitutes an adverse employment action differs from the discrimination context.[115]   For this claim, Petro-Ryder must show Defendants' actions were "materially adverse" as they would have "dissuaded a reasonable worker from making or supporting a charge of discrimination.[116]   "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence."[117]   If a plaintiff adduces facts of a *prima facie* case of retaliation, then the burden shifts under the *McDonnell Douglas* framework.[118]

Defendants concede Petro-Ryder engaged in protected activity, at the earliest, on June 16, 2014 when she discussed her concerns with Inspector McCarrick.[119]   Defendants argue Petro-Ryder has not suffered an adverse employment action and, even if she has, she cannot show Defendants' legitimate non-discriminatory reasons were pretext.

Petro-Ryder relies on the same alleged adverse employment actions as in her discrimination claim.    In retaliation claims, the adverse employment action must be contemporaneous with or after the protected activity.[120]     Accordingly, we can only consider

adverse employment actions occurring contemporaneously with or after June 16, 2014.  *Id.*  This timing dismisses many of her claims.  In many instances Petro-Ryder does not provide a date for the incidents and we cannot speculate as to when these incidents occurred.  However, even if they occurred after June 16, 2014, we find them to be insufficient adverse actions.  For example, monitoring the CO-26 email cannot constitute an adverse action especially when, before Petro-Ryder's protected activity, Pittman specifically told Petro-Ryder to delegate this task more often.[121]  Additionally, Pittman's counseling memorandum occurred before June 16, 2014 and is not considered in our analysis.

Yet, Pittman's renewal of Petro-Ryder's assignment to "last out" may constitute an adverse action which would dissuade a reasonable worker from making or supporting a charge. Petro-Ryder must also show a causal connection between the protected activity in June 2014 and the renewal in October 2014.[122]  To do so, she must show either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[123]   A plaintiff may also show a causal connection through "inconsistent reasons" given for the adverse action.[124]

Petro-Ryder does not adduce facts of a causal connection between the protected activity and the adverse action.  Petro-Ryder's protected activity occurred in June 2014 and the adverse action came in October 2014.  A span of four months by itself is not unduly suggestive of any retaliatory motive.[125]  Petro-Ryder does not attempt to show a "pattern of antagonism" which is also sufficient to show causation. Even if she did, the circumstances do not show it would be successful.    The Department detailed Petro-Ryder to the 24th District on July 9, 2014, and according to the record evidence, she did not have any contact with Pittman after that date.[126] Petro-Ryder cites an incident on August 21, 2014, when she found a "bag of green leafy

substance" on the floor of her vehicle while at 2nd District headquarters.[127]   She speculates

someone put the bag in her vehicle at Pittman's direction.   This claim is rank speculation.   This

single incident cannot amount to a pattern of antagonism especially where Petro-Ryder has no

evidence of who allegedly placed any substance in her vehicle.   Petro-Ryder only speculates

Pittman's role but we need not credit such speculation at the summary judgment stage.

Even presuming Petro-Ryder adduced facts of a *prima facie* case of retaliation, she

cannot show the given reason for the renewal of her "last out" assignment was pretextual.   Petro-

Ryder argues Pittman did not have a legitimate reason for keeping her on the "last out" shift and

thus the reason is pretextual.[128]   Pittman testified to keeping Petro-Ryder on the assignment as a

"Commissioner's Pick" because she did not have another platoon to which she could have

assigned her.   As discussed above, Petro-Ryder argues the "Commissioner's pick" is supposed to

be based on seniority.   However, as found in our discrimination analysis, this argument is belied

by the undisputed facts drawn from Petro-Ryder's testimony and the record evidence.   Petro-

Ryder testified that a "Commissioner's Pick" is not based on seniority but instead allows the

assigning supervisor to place any officer on "last out" and her renewal was a "Commissioner's

Pick" by Pittman.[129]   According to Department policy, fifty percent (50%) of the "last out" shift

is decided based on seniority, while the remaining fifty percent (50%) are "Commissioner's

Picks."[130]   Petro-Ryder wrongly states "a commissioners/captain's pick is supposed to be based

on seniority."[131]   In light of the evidence, her argument does not accurately represent the process

and Pittman's given reason is not pretext for any alleged retaliatory motive.   Summary judgment

is properly granted on this claim.

**F.      Petro-Ryder's Title VII hostile work environment claim is subject to summary judgment.**

Defendants' violation of Title VII may be shown by proving discrimination based on race created a hostile work environment.[132]  To demonstrate a Title VII hostile work environment claim, Petro-Ryder must establish: 1) she suffered intentional discrimination because of her race, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected her, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.[133]      In determining hostility, we consider "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[134]      We must look to the "totality of the circumstances" to determine whether a workplace is hostile.

As shown, Petro-Ryder cannot establish she suffered intentional discrimination because of her race or gender.  Petro-Ryder is not required to provide direct evidence of discrimination against her but rather must show circumstances from which it can be inferred race or gender were substantial factors in the discrimination.[135]      Petro-Ryder lacks evidence of, or circumstances inferring, racial animus motivating Pittman.  Petro-Ryder attempts to provide evidence of Pittman's hidden racial animus by introducing the President Obama poster and the Martin Luther King, Jr. quotes in Pittman's email.  These salutary references do not demonstrate racial animus towards Petro-Ryder just as the use of the term "indentured servant" in the negative does not.  Petro-Ryder has not adduced evidence of any decision by Pittman made because of her race or gender.  In some instances, Petro-Ryder claims Pittman treated African-American females more comfortably, seemingly undercutting her claim of gender discrimination.[136]      In other instances, she claims Pittman treated the Caucasian males more

favorably and seemingly undercutting her race discrimination claim.  This inconsistency drives to the heart of the insubstantial nature of any racial or gender animus alleged by Petro-Ryder. Instead, Petro-Ryder is left speculating as to some sort of racial or gender animus as a motivating factor behind every interaction with Pittman.  Petro- Ryder "cannot sustain a claim simply by asserting an event and then asserting that it was motivated by racial bias."[137]  Speculation is insufficient to overcome summary judgment.[138]

Petro-Ryder also cannot show the conduct was so severe or pervasive to alter the terms or conditions of her employment and such conduct is beyond Title VII's purview.[139]  The acts described by Petro-Ryder describe an office environment "uncomfortable" for her but not severe enough to become objectively hostile.[140]  "[D]iscourtesy and rudeness that may bother an individual with an eggshell psyche, does not violate Title VII."[141]  Petro-Ryder does not allege or show she was subject to any discipline by Pittman which other similarly situated African-American or male supervisors were not subject to.  Nor does she allege Pittman ever made arguably racist or sexist comments towards her or anyone other officer in the Department.  Petro-Ryder alleges the incidents occurred "non-stop for 10 months" apparently evidencing the pervasiveness of the conduct.  However, Petro-Ryder made up her mind after only one week on the job that she could not work with Pittman.  Petro-Ryder had a problem with the way Pittman managed the 26th District but Petro-Ryder provides no evidence Pittman subjected her to a hostile work environment based on her race or gender.    Summary judgment is granted on this claim.

### G.    Petro-Ryder cannot adduce facts of First Amendment retaliation.[142]

Defendants move for summary judgment on Petro-Ryder's First Amendment retaliation claim arguing she cannot establish a *prima facie* case as she did not engage in protected

activity.[143]   Even if she engaged in protected activity, Defendants argue she cannot show her speech was a substantially motivating factor in a retaliatory action.[144]

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation."[145]   To establish a First Amendment Retaliation claim, Petro-Ryder must show (1) constitutionally protected conduct under the First Amendment; (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.[146]

As a threshold matter, we must determine whether the First Amendment protects Petro-Ryder's underlying speech.[147]   A public employee's speech is protected when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement [s]he made."[148]   A public employee's speech involves a matter of public concern "if it can be fairly considered as relating to any matter of political, social or other concern to the community." [149]  In making such a determination, we must examine the "content, form, and context" of the speech.[150]

Petro-Ryder claims she engaged in protected activity when:  1) on June 20, 2014, she filed an internal EEO complaint specifying Pittman's racism towards her, Corporal Aversa, and the entire Department; 2) on July 7 and 28, 2014 and August 22, 2014, she filed PHRC and EEOC complaints with the same allegation; and,  3) when she filed this case on May 26, 2015.[151]  Relying heavily on *Montone v. City of Jersey City*, 709 F.3d 181 (3d Cir. 2013), Petro-Ryder argues these complaints are of public concern.  In *Montone*, a plaintiff police officer claimed her public employer retaliated against her political activities, as well as her involvement in "numerous sexual harassment investigations and complaints" against the police department over

a span of 17 years.[152]   Our Court of Appeals found the three separate instances of sexual harassment and the plaintiff's involvement in those complaints and investigations over a seventeen year period involved a matter of public concern.[153]

Our Court of Appeals' previous First Amendment jurisprudence found a singular internal claim of sexual harassment constituted a matter of public concern worthy of First Amendment protection.[154]   In *Azzarro*, the court found gender discrimination "when practiced by those exercising authority in the name of a public official, is as much a matter of public concern as racial discrimination practiced under the same circumstances."[155]   The court, though, did not categorically hold that all public employee complaints about sexual harassment or racial discrimination are inherently matters of public concern.[156]   Instead, the court found "that under all of the surrounding circumstances" the complaint addressed a matter of public concern.  *Id.*

We must evaluate all the surrounding circumstances.  We find Petro-Ryder's internal complaint regarding perceived race discrimination directed towards her, Corporal Aversa, and others does not constitute speech on a matter of public concern. As shown, her complaints were personal to her employment disputes.   Further, we find even if her personal employment concerns are public concern,  Petro-Ryder cannot establish a sufficient causal link between her protected activity and any adverse action taken in retaliation.

Petro-Ryder's allegations regarding discrimination directed towards others in the Department are essentially non-existent.   In our September 15, 2015 Order, we denied the Defendants' motion to dismiss Petro-Ryder's claim so early in the proceedings without the benefit of a "more fulsome record."[157]  We specifically focused on Petro-Ryder's allegation of discrimination towards others in the Department hoping to learn more about a public concern aspect of these allegations.  After discovery, Petro-Ryder provided no further content, form or

context of her discussion with Inspector McCarrick regarding alleged discrimination directed towards others in the Department.   Like so often in her brief, Petro-Ryder broadly alleges Pittman's racism towards another Caucasian female, Corporal Aversa, without explaining the actual discrimination or when it took place.

Even if Petro-Ryder's factually sparse complaint of systemic discrimination did encompass a matter of public concern, she cannot show a causal link between the protected activity and any adverse action taken.   "To establish the requisite causal link a plaintiff must usually prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[158]

The only action taken by Pittman which a reasonable juror could conclude would dissuade a reasonable person from exercising her constitutional rights is Pittman's October 2014 renewal of Petro-Ryder's assignment to "last out."[159]   On July 9, 2014, the Department assigned Petro-Ryder to the 24th District.[160]   Petro-Ryder's latest protected activity occurred on August 22, 2014, when she filed a subsequent PHRC complaint.[161]   The period from August to October is not unduly suggestive timing. [162]   Accordingly, Petro-Ryder failed to show temporal proximity.

Of course "where the temporal proximity is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test."[163]   Petro-Ryder apparently attempts to show a "pattern of antagonism" by citing an August 21, 2014 incident where she found a "bag of green leafy substance in a plastic bag" in her patrol vehicle.[164]   Petro-Ryder believes someone "planted" it in her car at Pittman's direction.[165]   On the same date, Petro-Ryder was the covering supervisor at the 25th District and failed to sign the cell block log

because she was dealing with the "green leafy substance."[166]   As a result, the Department investigated Petro-Ryder regarding the incident but did not impose discipline.[167]

Petro-Ryder has no evidence other than her subjective belief Pittman somehow has anything to do with these alleged incidents.   While we must view the facts in favor of Petro-Ryder, she cannot rely on and we must not credit "unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment."[168]   This speculation cannot defeat summary judgment.

Because Petro-Ryder cannot show a causal connection between her protected activity and Pittman's renewal of her "last out" shift assignment, summary judgment is properly granted on her First Amendment retaliation claim.[169]

### H.   Summary judgment is properly granted on Petro-Ryder's Equal Protection claim.

"The Fourteenth Amendment's Equal Protection Clause prohibits the denial of equal protection of the law to any person, 'which is essentially a direction that all persons similarly situated should be treated alike.'"[170]   Where a plaintiff proceeds in the absence of direct discrimination, an Equal Protection claim is subject to the *McDonnell Douglas* burden shifting framework.[171]   Since the analysis is the same and we already found Petro-Ryder failed to show the Defendants treated her less favorably than other similarly situated employees, we find her Equal Protection claim is subject to the same fate.   Summary judgment is properly granted on this claim.

## III.   CONCLUSION

Within a week of working for Pittman, Petro-Ryder requested a new assignment.   When declined, she allegedly suffered at least twelve (12) instances of race and gender discrimination, retaliation and equal protection violations.   After extensive discovery, she cannot adduce facts

transforming her employment grievances to cognizable claims. In the accompanying Order, we grant Defendants' motion for summary judgment as there are no genuine issues of material fact and, as a matter of law, Petro-Ryder cannot adduce evidence of race or gender discrimination, retaliation, hostile work environment or constitutional violations.

---

[1] (Defs.' SUMF, ¶ 21.) The Court's Policies require that a Statement of Undisputed Material Facts ("SUMF") be filed in support of a Fed.R.Civ.P. 56 motion as well as an appendix of exhibits or affidavits. Defendants filed their SUMF at ECF Doc. No. 28-1 ("Defs.' SUMF"). Defendants filed a "Joint Appendix" at ECF Doc. No. 28-4 through 28-9. Petro-Ryder responded to Defendants' SUMF at ECF Doc. No. 43-1 ("Pl.'s SUMF"). Petro-Ryder's responsibility was to add consecutively numbered Bates stamped documents to the "Joint Appendix." However, Petro-Ryder's appendix does not contain consecutively numbered exhibits but rather starts again at "P-1." Accordingly, we will refer to the exhibits as they appear in Defendants' Appendix whenever possible as "J.A. at 1" etc. If reference to one of Petro-Ryder's exhibits is necessary because it is not included in the J.A., we will reference it as "Pl.'s Ex. 1" etc.

[2] (*Id.* at ¶ 1.)

[3] (J.A. at 33.)

[4] (*Id.*)

[5] (*Id.* at 32-33.)

[6] (*Id.* at 34.)

[7] (*Id.* at 34.)

[8] (Defs.' SUMF, at ¶ 23.)

[9] (*Id.* at ¶ 6.)

[10] (*Id.* at ¶ 8.)

[11] (*Id.*)

[12] (*Id.*; J.A. at 306.)

[13] (J.A. at 306.)

[14] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[15] *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).

[16] *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001) (citing 42 U.S.C. § 2000e-5(e)(1)).

[17] 42 U.S.C. § 2000e-5(f)(1).

[18] *Id.*; *see also Burgh*, 251 F.3d at 470.

[19] *Burgh*, 251 F.3d at 470 (citing *Anjelino v. New York Times Co.*, 200 F.3d 73, 87 (3d Cir. 1984).

[20] (ECF Doc. No. 49, at 4-5.)

[21] *Gooding v. Warner-Lambert Co.*, 744 F.2d 354, 358-59 (3d Cir. 1984) (citations omitted).

[22] *Youssef*, 2008 WL, at *2.

[23] *Id.*

[24] *See Ebbert v. DaimlerChrysler Corp.*, 319 F.3d 103, 115 n.14 (3d Cir. 2003).

[25] Petro-Ryder's Title VII and PHRA claims are interpreted consistently and thus we only mention Title VII in our analysis. *See Scheidemantle v. Slippery Rock UNiv. State Sys. of Higher Educ.*, 470 F.3d 535, 539 n.5 93d Cir. 2006) (citations omitted).
[26] *Id.* at 980.

[27] *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

[28] *Iadimarco*, 190 F.3d at 158 ("No doubt because of this country's history of race relations, most Title VII plaintiffs have been members of a minority group, and the first prong of the *McDonnell Douglas* test was stated in the context of that history.")

[29] *Mosca v. Cole*, 217 F. App'x 158, 161 (3d Cir. 2007) (citing *Iadimarco*, 190 F.3d at 158).

[30] *Iadimarco*, 190 F.3d at 163 (citation omitted).

[31] *See Mieczkowski v. York City School Dist.*, 414 F. App'x 441, 445 (3d Cir. 2011) ("Even under the modified prima facie standard in reverse discrimination cases, a plaintiff must establish that she suffered an adverse employment action."); *Bristow v. Pennsylvania*, No. 13-1247, 2014 WL 7232105, *3 (E.D. Pa. Dec. 18, 2014) (citing *Iadimarco*, 190 F.3d at 163).

[32] *Carey v. Fed. Express. Corp.*, 519 F. App'x 772, 776 (3d Cir. 2013).

[33] *Id.*

[34] (ECF Doc. No. 49, at 6-7)

[35] *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 410 (E.D. Pa. 2014) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

[36] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Barnees v. Nationwide Mut. Ins. Co.*, 598 F. App'x 86, 90 (3d Cir. 2015).

[37] *Yarnall v. Phila. Sch. Dist.*, 57 F. Supp. 3d 410, 421 (E.D. Pa. 2014) (citation omitted).

[38] Petro-Ryder cites and purportedly quotes *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997).  The quote in Petro-Ryder's brief attributed to *Robinson* is inaccurate and misleading. Petro Ryder's brief reads: "As stated in *Robinson* [], Plaintiff's relegation to undesirable assignments, 'his being provided with improper supplies, and his subjugation to verbal harassment... are not just minor and even trivial actions that an irritable, chip-on-the-shoulder employee did not like.'" (ECF Doc. No. 49, at 7.)  This "quote" in the form provided by Petro-Ryder does not exist and after several attempts, Petro-Ryder's counsel did not correct the mistake.  Petro-Ryder combined a line from *Ferrell v. Harvard Indus.*, No. 00-2707, 2001 WL 1301461, *20 (E.D. Pa. Oct. 23, 2001)—a case Petro-Ryder cites in a string cite—with a line from *Robinson.*  After reading *Ferrell*, it becomes even clearer why Petro-Ryder changed the actual case language.  The relevant portion of *Ferrell* reads:

> Defendants are wrong, however, in their conclusion as to the lack of seriousness of Murray's relegation to undesirable assignments and machines he could not operate, his being provided with improper supplies, and his subjugation to verbal harassment. These are not just "minor and even trivial actions that an irritable, chip-on-the-shoulder employee did not like," as Defendant would have us find. *Id.* at 1300 (internal citations omitted); Def. SJ Mot. at 34.

2001 WL 1301461, at *20.  Counsel altered this passage and attempted to attribute it in whole to *Robinson.*  Then, in the very next sentence of the brief, Petro-Ryder argues, "[o]n the contrary, discriminatory assignments, undermining of work conditions and harassment are exactly the kind of actions that Title VII was designed to prevent. *See, e.g. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742."   Again, this is a direct quote from *Ferrell* to which Petro-Ryder provides no attribution other than to cite as an example.  "[C]itation to authority is absolutely required when language is borrowed." *United States v. Bowen*, 194 F. App'x 393, 402 n.3 (6th Cir. 2006); *United States v. Lavanture*, 74 F. App'x 221, 223 n.2 (3d Cir. 2003). (ECF Doc. No. __)

[39] 2001 WL 1301461, at *3.

[40] *Id.*

[41] *Id.*

[42] 2003 WL 1421297, *4.

[43] *Id.* at *5.

[44] *Rosati v. Colello*, 94 F. Supp. 3d 704, 714-15 (E.D. Pa. 2015) (finding assignment of additional responsibilities an insufficient adverse action).

[45] (J.A. at 314.)

[46] (*Id.* at 397-98, 625, 838.)

[47] (*Id.* at 83.)

[48] (*Id.* at 83-84.)

[49] *Yarnall*, 57 F. Supp. 3d at 421-26; *see also Blake v. Penn State Univ. Greater Allegheny Campus*, No. 09-1182, 2011 WL 841374, *9-10 (W.D. Pa. Mar. 8, 2011) (finding no adverse employment action for unnecessary monthly discipline conference, berating plaintiff in front of co-workers on minor or insignificant grounds, being burdened with harsh work assignments, and being overly monitored at work).

[50] (ECF Doc. No. 49, at 8.)

[51] (*Id.*)

[52] (*Id.*; see also Pl.'s SUMF, at ¶65; Defs.' SUMF, at ¶ 65)

[53] Petro-Ryder continually refers to Pittman's lack of choice when it came to her replacement's race.  (See Pl.'s SUMF, at ¶ 65; ECF Doc. No. 49, at 8.) If Petro-Ryder is contending a Caucasian employee must be replaced with another Caucasian, she is mistaken.  The law does not require employers replace an employee of one race with an employee of the same race. However, we interpret this to mean Pittman did not have a choice because all of the other lieutenants were Caucasian.

[54] (J.A. at 452-55.)

[55] *See Weston v. Pennsylvania*, 251 F.3d 420, 431 93d Cir. 2001), *abrogated in part by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006);  *Rosati v. Colello*, 94 F. Supp. 3d 704, 718 (E.D. Pa. 2015); *Torres v. Deblasis*, 959 F. Supp. 2d 772, 780-81 (E.D. Pa. 2013).

[56] 959 F. Supp. 2d at 781.

[57] *Id.*

[58] (J.A. at 17.)

[59] No. 05-4868, 2007 WL 4440880 (D.N.J. Dec. 18, 2007),

[60] *See Moore v. City of Phila.*, 461 F.3d 331, 341-42 (3d Cir. 2006).

31

[61] *Rivers*, 2007 WL 4440880, at *5.

[62] (ECF Doc. No. 49, at 9. )

[63] *Middleton v. Deblasis*, 844 F. Supp. 2d 556, 566 (E.D. Pa. 2011) (citing *Robinson*, 120 F.3d at 1301).

[64] (J.A. at 331.)

[65] *Johnson v. Cmty Coll. of Allegheny Cnty.*, 566 F. Supp. 2d 405, 431 (W.D. Pa. 2008) (citing *Robinson*, 120 F.3d at 1301).

[66] Petro-Ryder also argues Pittman used the term "indentured servant" and it offended her because she "interpreted" it to mean Pittman was referring to her as an indentured servant. This is unreasonable interpretation and we need not credit it. It is clear from Petro-Ryder's own recollection, Pittman used the term in the negative. In fact, the only instance where we have documentation of this incident is when Pittman sent a memorandum to all officers reminding them to pick up their trash as the janitor was not an "indentured servant." This cannot serve as evidence of racial animus.

[67] While they have no bearing on our analysis, it cannot go without noting the grand display of irony in Petro-Ryder's deposition testimony regarding the Martin Luther King, Jr. quotes. Petro-Ryder objects to the inclusion of these quotes in Pittman's email as racially offensive. (J.A. at 132.) She testifies, "Martin Luther King is not a neutral black figure"—whatever this means— "[h]e is a civil rights figure for our history . . . ." (*Id.*) The irony comes nine lines earlier where Petro-Ryder testifies she is "fighting for my civil rights." (*Id.*) We condemn racism in any form but do not view a complaint of Martin Luther King, Jr. quotes being racially offensive when at the same time Petro-Ryder is suing her employer under laws which he played an influential role in bringing to fruition.

[68] (J.A. at 134-35.)

[69] (*Id.*)

[70] (*Id.* at 134.)

[71] (*Id.* at 120.)

[72] (*Id.* at 238.)

[73] (*Id.* at 473-74.)

[74] *Mondzelewski v. Pathmark Stores, Inc* 162 F.3d 778, 788 (3d Cir. 1998).

[75] *Id.* at 780.

[76] *Id.*

[77] *Id.* at 787.

[78] *Id.* at 789.

[79] (J.A. at 137.)

[80] 162 F.3d at 787.

[81] (J.A. at 137.)

[82] *See Deans v. Kennedy House, Inc.*, 587 F. App'x 731, 734 n.4 (3d Cir. 2014) (finding change in schedule not adverse employment action where plaintiff failed to present evidence it was unfavorable to him).

[83] *See Mondzelewski*, 162 F.3d at 788.

[84] *Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 116 (3d Cir. 1996).

[85] *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (citation and internal quotations omitted).

[86] *Iadimarco*, 190 F.3d at 165-66.

[87] (J.A. at 120.)

[88] (*Id.*)

[89] (*Id.* at 835.)

[90] (*Id.* at 238.)

[91] (*Id.* at 238.)

[92] (*Id.* at 239.)

[93] *Iadimarco*, 190 F.3d at 166.

[94] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

[95] (ECF Doc. No. 49, at 14.)

[96] *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

[97] *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

[98] *Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (internal quotations omitted).

[99] (ECF Doc. No. 49, at 14.)

[100] *Fuentes*, 32 F.3d at 765 (citation and internal quotations omitted).

[101] *Id.*

[102] (ECF Doc. No. 49, at 14.)

[103] (J.A. at 120.)

[104] (ECF Doc. No. 49, at 14.)

[105] *Id.*

[106] (J.A. at 239.)

[107] (*Id.* at 329.)

[108] *Jones*, 198 F.3d at 410.

[109] (ECF Doc. No. 49, at 5.)

[110] (*Id.* at 11-12.)

[111] (*Id.* at 12-14.)

[112] *See Nardella v. Phila. Gas Works*, 997 F. Supp. 2d 286, 297 (E.D. Pa. 2014), *aff'd —F. App'x. —*, 2015 WL 4072772 (3d Cir. 2015).

[113] *Id.* at 295.

[114] *Moore*, 461 F.3d at 340-41.

[115] *Id.* at 341.

[116] *Id.* (citation omitted).

[117] *Burlington.* 548 U.S. at 67-68.

[118] *Moore*, 461 F.3d at 342.

[119] (ECF Doc. No. 28, at 13).

[120] *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).

[121] (J.A. at 314.)  Noting the different standard for adverse employment actions when it comes to retaliation claims, we again find none of the actions previously found insufficient for her discrimination claim to now be sufficient for her Title VII and First Amendment retaliation claims.  *See Alers v. City of Phila.*, 919 F. Supp. 2d 528, 554 (E.D. Pa. 2013) ("criticism, false accusations, or verbal reprimands" are insufficient to constitute adverse actions for First Amendment claim); *see also Rosati*, 94 F. Supp. 3d at 716-18.  Additionally, to the extent Petro-Ryder is arguing Pittman's alleged yelling and degrading comments are adverse employment actions, we disagree.  *See Middleton*, 844 F. Supp.2d at 570 (citing *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (holding admonishments, deemed 'harassment' by plaintiff, were not sufficient to constitute retaliation in the First Amendment context, in which the same standard applies)).

[122] *Moore*, 461 F.3d at 340-41.

[123] *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *see also Alers*, 919 F. Supp. 2d at 548.

[124] *Farrell*, 206 F.3d at 281 (citations omitted).

[125] *Bailey v. Commerce Nat. Ins. Servs., Inc.*, 267 F. App'x 167, 170 (3d Cir. 2008).

[126] (Pl.'s SUMF, at ¶ 15.)

[127] Pl's SUMF at ¶ 93.

[128] (ECF Doc. No. 49, at 14.)

[129] (J.A. at 239-40.)

[130] (*Id.* at 329.)

[131] (ECF Doc. No. 49, at 14.)

[132] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).

[133] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

[134] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

[135] *Abramson v. William Patterson Coll.*, 260 F.3d 265, 278 (3d Cir. 2001); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

[136] *See Nardella*, 997 F. Supp. 2d at 297.

[137] *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008).

[138] *Id.*

[139] *Oncale*, 523 U.S. at 81.

[140] *Bishop v. National R.R. Passenger Corp.*, 66 F. Supp. 2d 650, 664 (E.D. Pa. 1999).

[141] *Webb v. Merck & Co., Inc.*, 450 F. Supp. 2d 582, 598 (E.D. Pa. 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

[142] Petro-Ryder brings her First Amendment claim pursuant to § 1983, which provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

[143] (ECF Doc. No. 28, at 19.)

[144] (*Id.*)

[145] *Baldassare v. New Jersey*, 250 F.3d 188, 194-95 (3d Cir. 2001).

[146] *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citation omitted).

[147] *Azzarro v. Cnty. of Allegheny*, 110 F.3d 968, 975 (3d Cir. 1997).

[148] *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

[149] *Id.* at 195.

[150] *Baldassare*, 250 F.3d at 195 (citation omitted).

[151] (ECF Doc. No. 49, at 24.)

[152]  709 F.3d at 187.

[153] *Id.* at 194-95.

[154] *Azzaro*, 110 F.3d at 968.

[155] *Id.* at 978.

[156] *Id.* at 980.

[157] (ECF Doc. No. 19, at 3.)

[158] *Lauren W.*, 480 F.3d at 267.

[159]Petro-Ryder cites almost identical alleged adverse employment actions for each of her counts. Noting the different standard for adverse employment actions for retaliation claims, we again find none of the actions previously found insufficient for her discrimination claim to now be sufficient for her Title VII and First Amendment retaliation claims. *See Alers v. City of Phila.*, 919 F. Supp. 2d 528, 554 (E.D. Pa. 2013) ("criticism, false accusations, or verbal reprimands" are insufficient to constitute adverse actions for First Amendment claim).

As noted when discussing the discrimination claim, the court in *Rivers* did find a non-permanent "letter of warning" could be a sufficient adverse employment action in the retaliation context. 2007 WL 4440880, at *5. Without deciding whether the counseling memorandum issued by Pittman to Petro-Ryder constitutes an adverse employment action, it clearly occurred prior to any protected activity—the earliest of which is June 16, 2014. Pittman issued the counseling memorandum on June 11, 2014. Because it did not occur contemporaneously with or after the protected activity, we will not consider it in our analysis.

We are not convinced the 2014 performance review completed by Pittman constitutes an adverse action in the retaliation context. However, even if it did, we found Petro-Ryder failed to exhaust her administrative remedies for such a claim as it occurred after March 3, 2015.

Further, Petro-Ryder alleges she was subject to a drug test, which she says is retaliatory. The drug test took place April 9, 2015, approximately ten (10) months after Petro-Ryder's protected activity. There is no temporal proximity between this event and the protected activity, no intervening pattern of antagonism, nor does the record on the whole reveal an inference of retaliation for an event far removed from the protected activity. Moreover, we found this claim time barred as Petro-Ryder did not exhaust her administrative remedies on this incident.

[160] (Defs.' SUMF, at ¶ 15.)

[161] (ECF Doc. No. 49, at 24.)

[162] *See Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (stating a three month time period did not suggest causation); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759-60 (3d Cir. 2004) (affirming two months not unduly suggestive).

[163] *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (internal quotations omitted).

[164] (Pl.'s SUMF, at ¶ 93.)

[165] (*Id.*)

[166] (*Id.* at ¶ 95.)

[167] (*Id.*)

[168] *Rosati*, 94 F. Supp. 3d at 709, 714-15 (citing *Celotex*, 477 U.S. at 324).

[169] Defendants also argue Pittman is entitled to qualified immunity on Petro-Ryder's First Amendment retaliation claim.  As we find no underlying constitutional violation, we need not reach this argument.

[170] *Alers*, 919 F. Supp. at 556 (quoting *City of Cleburne, Tex. V. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

[171] *Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997).